## Andersen Coal Mining Company *v.* Sloan, Howell & Company, Appellant.

*Principal and agent—Authority of agent—Guaranteeing accounts—Disavowal of contract.*

Where the sales manager of a coal company has authority to transact such matters as the purchase and sale of coal, but has no authority to guarantee sales accounts, the coal company will be liable on such a guarantee, although unauthorized, if it does not disavow the contract as soon as it has knowledge that it has been made. An attempted disavowal two months afterwards, and after the coal company had sent a bill for commissions on the sale to the seller, is too late.

Argued Dec. 21, 1910. Appeal, No. 189, Oct. T., 1910, by defendant, from judgment of C. P. No. 3, Phila. Co., March T., 1907, No. 1,944, on verdict for plaintiff in case of Andersen Coal Mining Company v. Sloan, Howell & Company. Before Rice, P. J., Henderson, Morrison, Orlady, Head, Beaver and Porter, JJ. Affirmed.

Assumpsit on a guaranty. Before Davis, J.

The facts are stated in the opinion of the Superior Court.

The court charged in part as follows:

The plaintiff in this case, the Andersen Coal Mining Company, brings its action to recover the sum of $739.90, with interest thereon from December 20, 1905, for coal sold and delivered on December 14, and December 20, 1905, to the Hughs-Hatch Coal Company. The plaintiff claims that the coal was sold and delivered to the Hughs-Hatch Coal Company on the express guaranty of Sloan, Howell & Company, the defendant in this case. This guaranty, the plaintiff claims, was contained in a letter from Sloan, Howell & Company, to the plaintiff which was dated December 7, 1905. It has already been read to you, but I shall read it. It was written on the letter sheet of Sloan,

Howell & Company, incorporated, the defendant, addressed to the Andersen Coal Mining Company, the plaintiff, and reads as follows:

"Gentlemen, I am sending you herewith order for 500 tons of coal for delivery at Perth Amboy, New Jersey, as per your quotation made December 6.

"Notice this coal is to be consigned to Dupont, account of Whitney & Kammerer, and same to be charged to Hughs-Hatch Coal Co. These people are known by us and are perfectly good. We will guarantee this account.

"Trusting this initial order will receive your prompt attention, and it may result in continuous business relations between us, we remain,

"Yours very truly,

"B. N. Cole.

"Sales Mgr."

That is the note or letter upon which this suit is brought. That letter was a result of some conversation over the telephone between Mr. Ellicott, who was the manager of the plaintiff company in New York, and Mr. Cole, who held himself out to be the sales manager of Sloan, Howell & Company, the defendant. Mr. Ellicott testified that Sloan, Howell & Company, through Mr. Cole, called him up, after some correspondence in regard to 500 tons of coal. The price, according to the testimony of Mr. Ellicott, was $1.40, at which it was sold to Sloan, Howell & Company, the defendant. Quoting Mr. Ellicott, "They asked us to bill direct to the Hughs-Hatch Coal Company at that particular time. I told them we did not know the Hughs-Hatch Coal Company, and that we would bill it to them or would bill it to the Hughs-Hatch Coal Company if they desired, with the understanding that they should guarantee the account, which they agreed to do, and they wrote us on, I think, December 7, 1905, guaranteeing the payment of the account and asking us to bill the coal to the Hughs-Hatch Coal Company at $1.45, and credit them with the difference of five

cents a ton as their share of the profits." That was the conversation leading up to the letter of December 7, 1905, which I have read to you. Upon receipt of that letter, according to the testimony, the coal was shipped in accordance with the instructions set forth therein. Mr. Andersen, the president of the company, testified in corroboration of Mr. Ellicott, that they had shipped the coal to Hughs-Hatch Company, as requested by Sloan, Howell & Company, the defendant, and on February 1, he sent a statement of the account to Hughs-Hatch Coal Company, and subsequently drew upon them. In fact, according to his testimony, there were two drafts sent. He also testified that he came to Philadelphia in person, to ascertain why the drafts were returned, as they had been returned; that he went to the office of Hughs-Hatch Coal Company, or the Land Title Building where they were supposed to have their office, and they were not there.

[I may be anticipating somewhat in quoting the testimony of Mr. Andersen at this time upon those points, so I will say to you, that under the evidence in this case the questions for you to determine are, first, did the agent, Cole, have authority to make the contract guaranteeing the payment of the account? Second, if he did not have express authority to guarantee the account, did Sloan, Howell & Company, the defendant, disavow such authority and repudiate the contract? Or did they by any act ratify and confirm the act of their agent, Cole? In other words, did they fail to disavow the act of their agent in guaranteeing this account?] [3] Then another question for you to determine is, did the plaintiff proceed with due diligence to collect the account from the Hughs-Hatch Coal Company before proceeding against the defendant Sloan, Howell & Company in this action? [The plaintiff is obliged to prove authority in the agent to make the contract, or that the contract, having been made, was subsequently ratified by the defendant company. Such ratification may be express, or it may be implied from a failure to disavow any act of the agent after notice of the

act of the agent.   There is no evidence in this case of express authority in the agent to make a contract guaranteeing the payment of an account.   So that brings you to the consideration of the question, the agent not having express authority to make such a contract, did the defendant, by their actions, fail to disavow such a guaranty, and thereby ratify the action of their agent in making the guaranty?   That brings you to a consideration of the evidence as to whether there was a failure to disavow or whether you believe Sloan, Howell & Company, by their action and conduct, ratified the act of their agent in guaranteeing that account.   That is, I might say, the most important question for you to determine under the evidence.] [4].   On February 9, the plaintiff company wrote to Sloan, Howell & Company, the defendant, a letter, in which they said: "On December 7th, 1905, you placed an order with us for 500 tons of bituminous coal to be shipped to Dupont for account of Whitney & Kemmerer and you requested us to bill same to the Hughs-Hatch Coal Co., of Philadelphia, which we did.   The Hughs-Hatch Coal Co. have not paid our bill, do not answer our letters or telegrams and a draft on them was returned for want of address.   Will you kindly advise us of the street address of the Hughs-Hatch Coal Co., and get after them and see that they pay their bill?   In the event of their failure to do so we have no alternative but to look to you for the payment of same."   That brings us to the letter of February 10, 1906, which counsel for defendant argues was a disclaimer of any responsibility under a guaranty, and in that letter, which was sent by Sloan, Howell & Company to the Andersen Coal Mining Company, they say, "We have your favor of the 9th inst. regarding the account of the Hughs-Hatch Coal Co.   These people are located in the Land Title Building, Phila.   On taking the matter up with them on the phone this morning, these people claim the coal was sent by error of someone, to Perth Amboy, instead of South Amboy, N. J., where it was intended. Mr. B. N. Cole, our former sales manager, left our employ

on Jan. 31st, and we are therefore unable to get at the full facts in the case. However, we have urged the Hatch Company to make prompt settlement with you and they promise to take some definite stand by Wednesday morning next the 17th inst., which we will follow up closely. However, we must disclaim any responsibility for this account, inasmuch as you billed the coal direct and although we are perfectly willing to aid you in obtaining prompt settlement from the Hughs-Hatch Coal Co., we beg to advise that you must look to them for settlement of your account."

Now, gentlemen, it is a question of fact for you to determine, whether that was a repudiation or a disclaimer of the act of Cole in guaranteeing this account. You will notice there is no mention of Cole's act in that letter; they disclaim any responsibility for the account. That letter was followed by a letter of February 13, 1906, in which the president of the plaintiff company insists upon payment of the account, and he informs the defendant company that the plaintiff will look to the defendant in this action for the amount of the indebtedness. Subsequently, the plaintiff company sent a draft to Sloan, Howell & Company, the defendant, for the amount of this claim, and on March 2, 1906, the defendant company wrote to the Andersen Coal Mining Company in reference to that draft, a letter, in which they said, "In reply to your letter of the 27th inst., your draft was presented yesterday, which we refused pending our negotiations with the Hughs-Hatch Coal Company. We have an appointment with Mr. Hatch to-morrow (Saturday) morning, when we hope to be able to give you some definite information regarding this account. We have been working very hard with Hatch trying to get settlement out of him and had an interview with him last Saturday. He has been out of town all this week and, expecting him from day to day, we have called at his office every morning this week; however, he will be in town to-morrow and we are taking our former sales manager (Mr. B. N. Cole), who handled this trans-

action with us, in the hope of arriving at some definite and prompt settlement.

"You can readily understand that we have no claim whatever against the Hatch people should it come to a suit, inasmuch as you billed the coal direct, so we would request that you handle this matter in your name (with our help), until we are able to bring the matter to some climax. This we are doing all in our power to do and we trust you will bear with us until we can have a definite understanding with Mr. Hatch. He claims to be withholding payment pending the adjustment of some error in shipment, which, however, is neither your fault nor ours. However, he wants a 25c. reduction which we are not willing to stand and he, in turn, will not pay anything even on account, until this is settled. We are going to work this out to-morrow and we trust you will bear with us a little longer until we are able to bring him to time. He is a very hard man to catch, hence the delay in answering your correspondence. We will keep you fully advised of conditions and hope to receive his check to-morrow, which we would, of course, immediately forward to you."

[That, gentlemen, is briefly, the correspondence relating to the knowledge which the defendant had of this transaction. As I say, this question of ratification by a failure to disavow, is one for you under all the evidence. You will determine when the defendant company discovered, or might have discovered, the act of their agent, without their authority, in making this contract, and the actions of the defendant company after such discovery. It is for you to say whether, in view of this evidence, the correspondence, the testimony of the plaintiff, and the testimony of the defendant which has been offered in evidence —whether you believe the defendant company had knowledge of the contract of this agent and failed to disavow his act and repudiate the contract. And if you so believe, you would be justified in deciding that such failure to disavow amounted to a ratification of the act of the agent.] [5]

Now as to the third question—did the plaintiff proceed with due diligence to collect from the Hughs-Hatch Coal Company, before proceeding against the defendant company here? The plaintiff was bound to proceed with due diligence to recover from the principal debtor in order to hold the guarantor liable, but what amounts to due diligence is a question of fact for you in this case. And there is considerable correspondence between the plaintiff and the defendant bearing upon the question of the collection of this account. I have already referred to the testimony of the president of the plaintiff company, Mr. Andersen, wherein he said that he sent statements to the Hughs-Hatch Coal Company; that he sent two drafts to their office in Philadelphia; that he came over here personally to make an investigation, and he then got into correspondence with the defendant in this case. Counsel for defendant has made some reference in his address to you as to whether this coal was ever received by the Hughs-Hatch Coal Company. [And right here, I may say that it appears that this claim of the Andersen Coal Mining Company, the plaintiff, was assigned to Mr. Parett, representing Sloan, Howell & Company, and in their effort to recover the amount of this bill or account, they issued an attachment, and began two actions in the courts of common pleas of this county. In one of those actions, Mr. Parett, the assignee of this claim, swears in his statement of claim, "That Sloan, Howell & Co., a corporation duly organized under the laws of Pennsylvania, with power to act as sales agents, sold to John E. Hatch, the defendant, on or about December, 1905, five hundred tons of bituminous coal, and said defendant agreed to pay for the same the sum of one dollar and forty-five cents per gross ton, f. o. b., to said Sloan, Howell & Co., subject to the railroad weights at place of delivery. And the said coal was delivered by Sloan, Howell & Co. to the consignee, and upon being weighed in accordance with the custom of the trade," etc. The rest is not material, but I merely refer to that, the records being in evidence—that the assignee of this claim

swore that the coal had been delivered at Perth Amboy, or wherever it was consigned—that the coal had been delivered to the Hughs-Hatch Coal Company or to John E. Hatch, that suit being against John E. Hatch. There is no evidence to show that it was for any other claim than the one in question.] [6]

Verdict and judgment for plaintiff for $957.27. Defendant appealed.

*Errors assigned* were (1, 3–6) above instructions, quoting them, and (15) in refusing binding instructions for defendant.

*Thomas Ridgway*, for appellant.—A corporation has no power to enter into a contract of suretyship or guaranty, or otherwise lend its credit to another, unless the power is expressly conferred by its charter, or unless such a contract is reasonably necessary or is usual in the conduct of its business: Culver v. Real Est. Co., 91 Pa. 367; Assigned Est. of Miners' Bank of Summit Hill, 13 W. N. C. 370; Sword v. Reformed Congregation, 29 Pa. Superior Ct. 626; Smith v. Iron & Steel Co., 208 Pa. 462; Tift v. Nat. Bank, 141 Pa. 550; Gailey v. Plaster Co., 34 Pa. Superior Ct. 533; Curry v. Cemetery Assn., 5 Pa. Superior Ct. 289; Twelfth St. Market Co. v. Jackson, 102 Pa. 269; Stevenson v. Hoy, 43 Pa. 191; Oberne v. Burke, 30 Neb. 581 (46 N. W. Repr. 838).

The letter written by Cole, if he had had authority to insert the words he used, made his company a guarantor of the debt of the Hughs-Hatch Company. It was not an original undertaking, and the law adds the usual condition that there shall be due diligence used by the creditor to collect the claim from the principal, unless it appears that all diligence would be hopeless: Kellogg v. Stockton, 29 Pa. 460; Kemmerer v. Wilson, 31 Pa. 110; Mizner v. Spier, 96 Pa. 533; Tissue v. Hanna, 158 Pa. 384.

*Charles Biddle*, of *Biddle, Paul & Jane*, for appellee.—The decisions are clear that it is the duty of the principal

to give notice at once to third parties of the unauthorized act of his agent, so that the person defrauded may pursue the agent or do whatever else may be necessary to protect his claim, and not be lulled into security by supposing that the act of the agent is the act of the principal: Badders's Estate, 5 Pa. Superior Ct. 465; Kelsey v. Nat. Bank of Crawford County, 69 Pa. 426; Schrack v. McKnight, 84 Pa. 26; Bredin v. Dubarry, 14 S. & R. 27; Valentine v. Packer, 5 Pa. 333; Gordon v. Preston, 1 Watts, 385; Berger's App., 96 Pa. 443.

OPINION BY HENDERSON, J., March 3, 1911:

It is very clear that the contract out of which this action arises was made by the agent of the defendant in the course of the business of the company, which was the purchase and sale of coal. The plaintiff did not know the consignee except through the shipping instructions given by the defendant and offered to bill the coal to the defendant or to the Hughes-Hatch Coal Company if the defendant would guarantee the account. This the defendant agreed to do according to the plaintiff's testimony and thereupon the letter of December 7, 1905, was forwarded by the defendant's sales manager ordering the coal to be shipped to the Hughes-Hatch Company and guaranteeing the account. It is now said by the defendant that its agent exceeded his authority in making the guaranty and that it is not bound for its fulfillment. Conceding, however, that the agent was not authorized to give the warranty as an inducement to bring about the sale there was a question of ratification to be submitted to the jury arising out of the evidence introduced. The defendant desired to have the plaintiff send the coal to a company, as to the solvency of which it had no knowledge and as part of the transaction and presumably an inducement thereto this guaranty was given. The sale was to be profitable to the defendant as well as to the plaintiff and if the former did not authorize the sales manager to make the guaranty and did not intend to be bound thereby it was its plain duty to promptly

notify the plaintiff to that effect in order that the latter might take such steps as were expedient to protect itself by refusing to make the shipment or instituting such proceeding as might be adopted to recover the price. The sales manager had unquestioned authority to transact such matters as the purchase and sale of coal and the plaintiff might easily be misled as to the extent of his authority. It was the duty of the defendant, therefore, to disclaim the act of its agent as soon as informed of the fact. It was said by Gibson, J., in Bredin v. Dubarry, 14 S & R. 27, to be "undisputable that a principal who neglects promptly to disavow an act of his agent by which the latter has transcended his authority makes the act his own. He is bound to disavow it the first moment the fact comes to his knowledge." Of like import is Valentine v. Packer, 5 Pa. 333. In Kelsey v. Natl. Bank, 69 Pa. 426, the cashier of the bank had offered a reward for the apprehension of thieves who had robbed the bank. The question of the authority of the cashier ex officio to offer the reward was not determined but it was held that even if he had no authority the bank was liable for the reward if the offer was acquiesced in and ratified by the directors and in that connection the court stated that "the law is well settled that a principal who neglects promptly to disavow an act of his agent by which the latter has transcended his authority makes the act his own." The same conclusion was reached in Schrack v. McKnight, 84 Pa. 26. Where the principal has been informed of what has been done he must dissent and give notice to that effect within a reasonable time and his failure so to do will raise a presumption of assent and ratification: Bank of Pa. v. Reed, 1 W. & S. 101; Berger's Appeal, 96 Pa. 443. After such acquiescence by silence in an act done under an assumed authority in the course of the business of an agent the principal cannot afterward be heard to repudiate such act on the ground that it was done without authority. This principle is expressed in a maxim of the law. And this applies as well to corporations as to individuals: Gordon

v. Preston, 1 Watts 385; Bank of Penna. v. Reed, 1 W. & S. 101; Kelsey v. Natl. Bank, 69 Pa. 426. A jury might conclude from the evidence offered that the principal part of this shipment of coal was made after the president of the company had knowledge of the order for the coal and the accompanying guaranty given by the sales manager. This notice to the executive head of the corporation and the officer in charge of its business affected the corporation and imposed on it the duty to disavow the act of its agent if in excess of his authority if the corporation did not intend to be bound. Letters from the defendant were also introduced which tended to show that it recognized its responsibility for the bill when the plaintiff was urging a settlement of the account and in one of them a request was made for delay to enable the defendant to collect from the Hughes-Hatch Company. It is contended however that the defendant did disclaim the act of its agent by means of a letter addressed to the plaintiff dated February 10, 1906, in which reference is made to the demand of the plaintiff for settlement of the Hughes-Hatch bill in which letter the defendant states "We must disclaim any responsibility for this account inasmuch as you billed the coal direct." This it will be observed does not refer to the guaranty on which the plaintiff relies but puts the defendant's exemption from liability on the fact that the coal was shipped directly to the consignee and not charged to the defendant. That is not on its face a repudiation of the act of the agent and if it were, it could not have been held by the court to have been sufficient in time, for the last shipment was December 20, 1905, and this letter was nearly two months later and some weeks after the president of the defendant company knew the terms under which the plaintiff shipped the coal. It was then too late for the plaintiff to protect itself as against the consignee by refusing to fill the order and even if the disclaimer had been expressly directed to the act of the agent we think the question would be one for the jury whether it had been given within a reasonable time under the circumstances.

Moreover, more than a month after the coal was shipped and apparently after the president of the defendant had seen the guaranty the defendant sent a bill to the plaintiff for its commissions on the sale and this was evidence of ratification of the act of the agent. The company could not claim the benefit of part of the contract and repudiate the other part where the whole was involved in a single transaction. The cases cited by the learned counsel for the defendant are those in which the act done was outside of the scope of the objects of the corporation or where there was no evidence of ratification and do not aid the appellant in maintaining the defense relied on. The point is made that the plaintiff did not use due diligence in attempting to collect the claim but the jury has found for the plaintiff on this point and there is evidence which required its submission. Indeed, it is shown that the defendant undertook to collect the debt and made diligent effort in that direction but failed. The assignments are numerous but it is unnecessary to refer to them seriatim. The letter containing the guaranty was properly admitted as the evidence tended to show that whether the agent had express authority to make the guaranty or not there was an acquiescence in, and ratification of, his act by the defendant. The records offered in evidence by the plaintiff in the cases against Hatch are not presented and we are unable to say whether they were relevant or not. They were admitted on the offer to show the act of the defendant in endeavoring to collect the debt from the Hughes-Hatch Company and were presumably pertinent to that inquiry. In order to obtain the judgment of this court on the question the records should have been printed. The case was submitted in a charge which fairly presented the facts and stated the legal propositions involved and we do not find any error which requires reversal.

The judgment is affirmed.